54 CCPA

**Application of John R. JOHNSON.**
**Patent Appeal No. 7626.**

United States Court of Customs
and Patent Appeals.
Dec. 19, 1966.

John R. Nelson, Toledo, Ohio (Basil C. Foussianes, Detroit, Mich., George A. Degnan, Washington, D. C., of counsel) for appellant.

Joseph Schimmel, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel) for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRK-PATRICK.*

RICH, Acting Chief Judge.

This appeal is from the unanimous decision of the Patent Office Board of Appeals[1] affirming the examiner's rejection of claims 1–3, 10–17, and 28–29 in application serial No. 835,361, filed August 21, 1959, for "Detearing Method." In his brief, appellant "waives the appeal with respect to claims 14 and 15." Claims 8, 9, and 30 have been allowed.

The invention is a method of treating articles such as plastic coated glass bottles or jars used as aerosol packages for cosmetics, alcohol products, etc., by physically manipulating the articles, upon their removal from a bath of liquid coating material or "plastisol,"[2] in such manner as to cause the "tear drop" of liquid adhering to the lowermost portion after drainage to flow or merge *smoothly* into the coating before it sets, thereby providing a package of more pleasing appearance and feel, more susceptible to the application of a decorative material, and offering greater stability when placed in an upright position. The process is known as "detearing", and was accomplished, prior to appellant's invention, for example by wiping the tear or by use of an electrostatic process, all of which were allegedly either uneconomical or otherwise impractical.

Appellant's process consists of rotating the article about its longitudinal axis and *simultaneously* inverting the same while the coating is still in a flowable condition.

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Consisting of Examiner-in-Chief Rosa and Acting Examiners-in-Chief Seers and Hull, the latter writing the opinion.

2. Exemplified in appellant's application by a vinyl resin dispersion comprising 100 parts polyvinyl chloride, 80 parts diisooctyl phthalate, 1 part tin mercaptide, and a pigment ingredient to impart the desired color.

Its operation and effects are clearly seen in the accompanying drawings and quota- tion from appellant's application (brack- eted numbers inserted):

PA 7626

Turning now to Figs. 3–5, the detear- ing action will be explained. As the bottles [27] advance from the bath [28] of the liquid coating material,

they are lifted from the bath until a point [I] of final separation between the coating on the bottle and the material running back to the bath occurs. At this point, the tear drop or blister-like spot [30] will be formed, as illustrated in Fig. 5. As the movement of the bottle advances in its reversing path around the sprockets 18 to the location indicated by numeral I on Fig. 3, this tear drop will appear at the bottommost edge of the bottle bottom. If the bottle at I is viewed from a point on a radius of the sprocket 18 coinciding with the central axis of the bottle, this tear drop will appear substantially as shown in the diagrammatic sketch numbered I of Fig. 4.

As the bottle advances to the point indicated by II in Fig. 3, the combined rotational movement of the bottle about the shaft 21b and its own central axis will have enlarged this tear drop to the extent shown diagrammatically in the sketch labeled II of Fig. 4. Subsequently, as the bottle advances to the stages indicated III, IV, and V, on Fig. 3, the tear drop will be progressively merged into the coating at the bottom of the bottle, as indicated diagrammati-

cally in the sketches labeled III, IV, and V of Fig. 4, whereupon the tear drop is eliminated and merged into a smooth coating at the bottom of the bottle.

Claim 1 reads:

1. The method of detearing the coating on a contiguous external surface, such as the bottom surface of an upright article after it is taken from a bath of a dipping liquid and before the liquid coating is permitted to set substantially, comprising the steps of inverting the article by continuos movement in a substantially vertical plane, and, simultaneously during said continuous inverting movement, continuously rotating the article about its central axis.

This claim is illustrative of the claims except claims 10–13 and 17, which additionally recite the step of heating the coated article either during or immediately following the inversion process "at least sufficiently to set said coating so that it is in a non-flowable condition," and claims 28 and 29 which call for "drying and cooling the thus-coated container."

The references are:

| | | |
|---|---|---|
| Mueller et al. | 1,708,429 | Apr. 9, 1929 |
| Kachele | 2,981,639 | Apr. 25, 1961 |
| | | (Filed Oct. 15, 1956) |

---

Mueller et al. disclose a method of coating the neck and cap-portion of bottles by means of an endless carrier, similar to appellant's, which dips the bottles upside down into a bath of a "seal-forming substance," and then inverts the coated bottles by continuous movement in a substantially vertical plane. The bottles may be rotated about their own axes for the period of time in which they are immersed and for *a portion* of the time during which they are being inverted. The patentees prefer to use cellulose acetate dissolved in acetone as the sealing material. They do not apply heat, but, instead, partially dry the coating by con-

tacting it with an atmosphere of the solvent vapor during the arcuate travel and axial rotation, and then complete the drying operation by letting the bottles stand in air at room temperature, whereupon a film is formed on the surface of the liquid coating which prevents it from flowing. In time it dries completely.

Kachele discloses a continuous process for coating bottles, with essentially the same materials and for the same purpose as appellant, by dipping the bottles in an upright position into a bath by a sudden swinging action, slowly lifting them out of the bath, *rapidly* inverting them essentially 180° rather soon after they leave

the bath, and thereafter heating the articles to gel or harden the coating. Kachele does not impart an axial rotation to the bottles.

The examiner said (emphasis ours):

> Claims 1–3, 10–17, 28, and 29 stand rejected as unpatentable over Mueller in view of Kachele. Mueller discloses the claimed invention except (1) the top of the article is coated rather than the bottom (2) an interim of rest from rotation is suggested rather than continuous rotation and (3) air curing rather than heat curing is disclosed. Kachele teaches coating the bottoms of bottles and heat curing of the bottles after coating. As far as (1) is concerned which appears in claims 2, 3, 14–17, 28, and 29, it is not considered patentably material whether one employs the process of Mueller to coat the top or bottom of an article. It is merely a matter of choice which part of the article one desires to coat. In any case Kachele teaches that it is well known in the bottle coating art to coat the bottoms of bottles in a process quite similar to that of Mueller. * * * As to (2) which is the only distinction appearing in claim 1 *Mueller teaches that rotation of the bottle about its longitudinal axis while inverting "equally distributes the sealing film";* and although Mueller then proceeds to rotate only for a portion of the inversion time, it is considered well within the skill of the art to choose a rotation time suitable to obtain this goal. Applicant's Rule 132 affidavit of November 5, 1962 and the affidavit of Paul L. Wilt, July 11, 1963 purport to show that an intermittent rotation produced an unsatisfactory coating. However, it is the Examiner's opinion that such results were obtained with certain coating viscosities, speed of rotation, speed of bottle movement, bottle size, etc., none of which are claimed and that applicant has by no means proved that

continuous rotation is critical under all conditions. In the Mueller patent, the coating characteristics, speed and bottle shape and size were apparently such that a shorter rotation period sufficed. With different coatings and bottles, the skilled artisan could readily adapt the Mueller process to obtain a uniform coating. Considering point (3) which is the heat curing called for by claims 10–13 and 17 it is thought to be obvious to employ a heat curing step rather than an air drying step where necessary or the coating material so requires. Heat curing is also taught by Kachele. Applicant argues that Kachele does not heat as promptly as the claimed process and that Kachele does not heat to gell [sic] the coating. However, it is seen that Kachele heats the coated articles practically as soon as does applicant and clearly discloses heating to gell [sic] * * *.

The board, in effect, adopted this reasoning as its own, and so do we, but substituting the statutory expression "a person having ordinary skill in the art" for the examiner's term "the skilled artisan." 35 U.S.C. § 103.

■■ Moreover, as we view this case, appellant's discovery is that simultaneous rotation and inversion results in uniform distribution of the liquid coating.[3] Mueller et al. teach that very concept. While the patentees did not rotate continuously during the *entire* inversion, as does appellant, i. e., from a 5 or 6 o'clock position counter-clockwise to a 12 o'clock position, but only during a 3 to a 1 o'clock change in position, we think it is clear that *the reason* they rotated their bottles at all was to distribute the coating more uniformly. That being so, we think changing the duration of rotation to that corresponding to some greater or lesser arc of inversion is an obvious variation of the Mueller et al. disclosure, particularly when a different coating material is employed. Certainly, starting the rotation

---

**3.** We judicially notice that most people make this discovery at an early age while eating strained honey, observing that it does not run off the spoon if it is rotated and inverted at the same time.

sooner and ending it later, and finding an improved coating distribution, is not unexpected in view of the reason Mueller et al. advance for their rotation step. Yet that is all we think the comparative affidavits establish.

Nor do we find those claims which further recite a heating step to define a non-obvious invention. Kachele clearly shows a process comprising the *combination* of (1) a step bringing about the distribution of a tear drop, although the patentee does not call it that, with (2) a heating step. While appellant apparently heats his coated article sooner than does Kachele to obtain what appellant terms "setting," we are unable to find that to be patentably significant. Both appellant and Kachele heat following application of the coating, and both heat for the purpose of hardening the plastisol material. Thus, we do not find persuasive appellant's argument that Kachele teaches heating for a purpose different than his. The purpose of each process is to render a flowable material non-flowable. Whether this be "setting," "baking," "curing," or "hardening" is immaterial, we think, for the effect is the same as far as stopping flow is concerned. In addition, we note that Kachele pre-heats his bottles prior to dipping and this conceivably suggests some "setting" of his plastisol during or immediately following inversion, but prior to entering the oven.

We have considered appellant's many other arguments, including those directed to previous decisions of this court, but are of the view that the decision of the board should be affirmed.

Affirmed.

SMITH, J., took no part in the decision of this case.

MARTIN, J., participated in the hearing of this case but died before a decision was reached.